UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Karen Eckstrom,

Plaintiff,

v.                                                        Civil No. 11-812 (JNE/JJG)
                                                          ORDER
Bio-Medical Applications of Minnesota, Inc.
(BMA); an affiliate of Fresenius Medical Care
Holdings, Inc.; a/k/a Fresenius Medical Care,
all foreign corporations doing business in Minnesota;
Patrick Howard and John Marietti,

Defendants.

Plaintiff Karen Eckstrom ("Eckstrom") brought this action against Defendant Bio-

Medical Applications of Minnesota, Inc. ("BMA"), alleging unlawful retaliation in violation of

the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e-2 *et seq.*, and 42 U.S.C. § 1981.

Eckstrom also asserts a claim of defamation against Defendants John Marietti ("Marietti") and

Patrick Howard ("Howard").  BMA, Marietti and Howard moved for summary judgment on all

claims.  For the reasons stated below, their motion is granted.

## I.      BACKGROUND[1]

### A.  Eckstrom's Employment with BMA

BMA operates dialysis facilities that provide dialysis treatment to patients with end-stage

renal disease.  BMA's clinics are staffed by a Medical Director (a physician),[2] a Clinic

Manager, a registered nurse, a social worker and a dietician, among others.  In 2009, Clinic

---

[1]     The facts described below are undisputed or are those that a reasonable factfinder could
find when viewing the record in the light most favorable to Eckstrom.

[2]     The physicians and Medical Director are not BMA employees.  Rather, BMA contracts
with physician groups for medical director services at BMA's clinics.

Managers, who were responsible for the day-to-day operations of their clinics, reported to a Director of Operations.[3]  The Directors of Operations reported to a Regional Vice President ("RVP").  BMA hired Eckstrom as a renal social worker in April 1999.  Eckstrom worked in BMA's Midway, Shakopee, South Minneapolis, and Southtown clinics.  At the time of her termination in August 2009, the Midway clinic was her "home" clinic.  Linda Swan was the Clinic Manager at Midway.  Ms. Swan reported to Director of Operations Patrick Howard, who in turn reported to Kelli Tarlton, the RVP for BMA's clinics in the Upper Midwest Region.

From 2001 until 2008, Eckstrom received annual performance reviews.  In 2001 and from 2003 through 2007, she was given an overall rating of "exceeds standards."  In 2002 and 2008, she was given an overall rating of "meets standards."  Her last performance review, completed on June 23, 2008, indicated that Eckstrom was "meet[ing] standards" in four categories and was "meet[ing] standards at times" in two categories.  Her noted weaknesses were that her quality of work was inconsistent as evidenced by progress notes that were not completed on time and "inaccurate assmts," and that it was "a challenge to account for her schedule."[4]  There appeared to have been issues with "maintaining required documentation."  Under "overall performance," Eckstrom was noted to have "expert and extensive knowledge in social work issues involving patients with chronic renal failure" and "very strong professional community ties and referrals."  Her supervisor commented that Eckstrom "enthusiastically helps others and

---

[3]    The Directors of Operations are sometimes also called "Area Managers."

[4]    This was not the first time that weaknesses or areas for improvement were noted in Eckstrom's performance evaluations.  In 2002, her review indicated that she "needs to manage time appropriately, decrease fragmenting her days, and commit to a unit a day" and that she needed to "improve on communicating her schedule to units and staff."  In 2003, her review indicated that she could improve upon her scheduling and planning ahead, because some staff found her "difficult to find."  From 2004 through 2007, Eckstrom's scheduling, organization and communication continued to be areas for improvement.

offers her assistance with special projects and fundraisers and is always willing to pick up extra work when needed."

**B.  Eckstrom's Involvement in Shashi Pandey's Lawsuit**

During Eckstrom's employment with BMA, one of the people she worked with was Shashi Pandey ("Pandey"), another social worker employed by BMA.  Pandey's employment was terminated in 2003.  After her termination, Pandey filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against BMA, alleging discrimination and retaliation.  In 2005, the EEOC contacted Eckstrom as part of its investigation.  Eckstrom told the EEOC only that she was concerned about retaliation if she were to provide any information regarding Pandey's claim.  Eckstrom then told her manager at the time, Carol Meredith, that the EEOC had contacted her.  Eckstrom had no further conversations with the EEOC after that initial conversation.

In October 2007, Pandey filed a civil lawsuit against BMA, alleging discrimination under the ADA, Title VII, and 42 U.S.C. § 1981.  *Pandey v. Bio-Medical Applications of Minn., Inc.*, Civil No. 07-4266 (JMR/FLN) (D. Minn.).  On July 7, 2008, Pandey was deposed, at which time she indicated that Eckstrom may have witnessed some of the allegedly discriminatory and/or retaliatory conduct.  Eckstrom provided deposition testimony in Pandey's lawsuit on October 30, 2008.[5]  According to Eckstrom, the BMA supervisors aware of her participation in Pandey's lawsuit included her then-manager Carol Meredith, as well as Directors of Operations Patrick Howard and John Marietti.  On August 10, 2009, the Court denied BMA's motion for summary

---

[5]     The parties dispute the value of Eckstrom's testimony.  Eckstrom contends that her testimony was largely beneficial to Pandey's claims; BMA asserts that Eckstrom's testimony actually helped BMA.  The substance of Eckstrom's testimony, for purposes of this motion, is irrelevant.

judgment on Pandey's claims of retaliation and discrimination.  In that order, the Court briefly cited Eckstrom's testimony.

## C.  BMA's Investigation and Termination of Eckstrom's Employment

BMA utilized two forms with respect to each patient's insurance status.  Upon each new patient's admission, a Medicare Secondary Payor Questionnaire ("MSPQ") would be completed. On a quarterly basis, the renal social workers were tasked with completing a Social Worker Insurance Questionnaire to verify the patients' insurance information.  After the social workers verified the insurance information with the patient, they were required to obtain a dated signature from the patient.  If the insurance information changed from the previous quarter, the social workers would then have to complete a new MSPQ with the updated information.[6]

BMA maintained a confidential compliance hotline (the "Compliance Action Line," or "CAL"), which employees could call and anonymously report their concerns.  On June 9, 2009, a BMA employee called the CAL and anonymously reported that Eckstrom "falsifies the social worker insurance questionnaire verification."  Tarlton Dep. Ex. 3.  The compliance officer who received the call reported:

> The Caller said a social worker insurance questionnaire is a form that social workers update quarterly to verify that a patient's current insurance information is on file.
>
> During the week of May 24, 2009, the Caller found out that Karen Eckstrom uses the previous quarters social worker insurance questionnaire, changes the date to a

---

[6]    There appears to be confusion regarding the names of these two forms.  Eckstrom refers to these forms as the "MSPQ" and "Social Worker Insurance Questionnaire."  Patrick Howard referred to the forms as the "MSPQ" and the "quarterly questionnaire" or "quarterly form." Howard Dep. 65:9-17, 68:23-25.  Kelli Tarlton was unaware that there were two different forms, calling them both "MSPQ" forms.  She was, however, aware that the form at issue in Eckstrom's termination was a form that was to be filled out on a quarterly basis.  Tarlton Dep. 74:23-75:25. Celeste Kienzle referred to the forms as the "MSPQ admit form" and the "MSPQ quarterly form."  Kienzle Dep. 63:14-16.  John Mariette referred to the forms as the "official MSPQ" and the "Fresenius form."  Mariette Dep. 35:9-36:22, 46:25.

> current date and sends it to the company as an updated questionnaire.  If the
> questionnaire is not updated quarterly the patients insurance information on file
> could be incorrect.
>
> The company policy states a social worker insurance questionnaire must be
> verified and updated quarterly and signed by the social worker and patient.
>
> The Caller said Karen falsifies the social worker insurance questionnaire to "get
> around the rules."

*Id.*  On June 16, 2009, Ethics and Compliance Officer Dottie Sample contacted RVP Kelli

Tarlton and informed her of the complaint.  Tarlton then assigned Director of Operations Patrick

Howard to investigate the allegations.

The next day, Howard examined Eckstrom's files at the South Minneapolis and Midway

clinics.  He found no compliance violations at the South Minneapolis location, but he found three

types of problems when he examined files at the Midway clinic.  First, Howard found original

forms for patients of the Shakopee and Southtown clinics at Midway.  According to BMA,

patient records were to be kept in the patient's file at the patient's clinic—the records were not to

be moved to other locations.  Second, Howard found forms that contained original insurance data

and signatures, but were undated.  Third, Howard found a form on which he believed white-out[7]

had been used.

Howard then contacted the billing group to compare the original documents he found to

those that were submitted.  Based on his investigation, he concluded that Eckstrom had

photocopied original signed, but undated, forms from previous quarters and then submitted the

photocopies after filling in a new date.  He believed that this conduct constituted falsification of

patient records because the forms, as submitted to the billing department, represented that the

patients had signed the forms on the date provided—the date on which Eckstrom reviewed the

---

[7]     The parties refer to the use of "Wite-Out," but there is no evidence that the Wite-Out™
brand of correction fluid had been used.  The Court will therefore refer to it as "white-out."

information with the patients—but that in fact, the patients had previously signed the forms on a different date.  Howard believed this practice violated BMA's policy, which required social workers to complete a new form and obtain a new signature and date each time they reviewed the form with the patient.  He communicated his findings to Tarlton.  Soon thereafter, Howard began a military leave of absence, and the investigation continued without him.

Tarlton instructed Celeste Kienzle[8] to interview Eckstrom regarding her practice of filling out the insurance questionnaires.  Director of Operations John Marietti witnessed the interview.  On July 16, 2009, Kienzle and Marietti met with Eckstrom and discussed her completion of the Social Worker Insurance Questionnaire.[9]  Eckstrom Dep. 134:19-24, 135:18-19; Marietti Dep. 35:21-37:22, 46:23-25; Kienzle Dep. 63:8-16.  Eckstrom testified that she does not remember what she told Kienzle and Marietti at that meeting.  Eckstrom Dep. 135:23-136:11.  Kienzle testified that during the meeting, Eckstrom acknowledged that she had used pre-completed and pre-signed forms in an effort to be efficient and that she had used white-out in the past, but that she stopped doing that about a year before.  Kienzle Dep. 50:14-22.  Kienzle's notes from that meeting reflect that Eckstrom acknowledged that she had previously used photocopied forms that contained completed insurance information and signatures, but had blank date lines, and would then fill in a "fresh" date on the date the information was reviewed with the patient.  *Id.* 85:19-86:23.  Kienzle's notes also indicate that Eckstrom had previously used white-

---

[8]     It is unclear from the record whether Kienzle was an Operations Manager or a Clinic Manager at the time of the investigation.

[9]     The parties dispute whether or not they also discussed the MSPQ forms.  Eckstrom testified that they questioned her about the MSPQs, but Kienzle and Marietti both testified that that they asked her about only the quarterly forms (which Kienzle calls the "MSPQ quarterly forms" and Marietti calls the "Fresenius form").  Eckstrom Dep. 132:24-25, 134:8-9; Mariette Dep. 35:21-37:22, 46:23-25; Kienzle Dep. 63:8-16.

out to correct an incorrect date.  *Id.*  Marietti testified that he remembered Eckstrom having admitted to using white-out on forms.  Marietti Dep. 39:5-8, 40:14-18.

After the interview with Eckstrom, Kienzle reported back to Tarlton.  Tarlton consulted with Tracey Crandall, Vice President of Human Resources, North Division, regarding the investigation.  Crandall spoke with her supervisor, Claire Callahan, Vice President, Human Resources & Organizational Development.  Crandall and Callahan agreed to have a Human Resources team member interview Eckstrom.  On August 18, 2009, Employee Relations Manager Denise Warren interviewed Eckstrom regarding her completion of the Social Worker Insurance Questionnaire.[10]  Warren's notes of her interview with Eckstrom explain that Kienzle "seemed unclear of what the concerns were" during Kienzle's interview with Eckstrom, and that as a result, Eckstrom's answers "were probably vague and incomplete."  Tarlton Dep. Ex. 5.  The note continued,

> The intent was to save time only.  [Karen] states that once she had an original questionnaire completed she would have the patient sign and then copy without the date.  She would then use that copy, review with the patient and then date with that review date.

> Karen states that she discovered that since patients come and go from the system this was not an efficient way to do it and has now changed her practice to completing the forms with each patient at chairside for each quarter using a blank MSPQ.

> Karen states that she has not been using the pre-signed forms for at least 6 months.  I asked her about her statement that it had been at least one year.  She replied that unless she sees examples it is hard to answer that but it is not happening now or at least in the last quarter.  She stopped because it was not saving her any time.

> She states she did use white out but still reviewed the form with the patient.

---

[10]     Sometime after 2009, Ms. Warren changed her name to Denise Patterson.  For the sake of simplicity, the Court will refer to her as Denise Warren.

> Karen states that she had the binders in Midway because that is her home clinic
> and she is regularly carrying things back and forth from her 4 clinics.

*Id.* Eckstrom admits that she told Warren that once she had an original questionnaire completed, she would have the patient sign the form, and she would then copy the form without the date portion completed. Eckstrom Dep. 231:16-21. Eckstrom told Warren that she would then use that undated copy, review it with the patient, and then date it with the date of the review. *Id.*

Warren reported back to Crandall after conducting the interview. Crandall stated that Warren "validated . . . [Howard's] accounts of the events and documentation, and again Karen admitted to the altercation [sic] that she did of the patient attestation, so the fact pattern lined up." Crandall Dep. 51:6-11; *see also id.* 54:2-4 ("She validated that Pat's fact pattern timeline was accurate and that Karen had admitted it."). Crandall provided Warren's interview notes to Tarlton and stated that she saw what Eckstrom did as "falsification." Tarlton Dep. Ex. 5. Crandall had also previously received and reviewed some of the documents that were purportedly "falsified." Crandall Dep. 32:11-12, 36:14-17. Crandall explained that BMA had "a zero tolerance policy of the falsification of any record," *id.* 42:24-43:4, and stated that she "would support term[ination] for falsification and failure to follow proper documentation procedure," Tarlton Dep. Ex. 5.

When Howard returned from military leave, he was updated as to the results of the investigation. Based on those results, Tarlton, Howard and Crandall agreed that termination of Eckstrom's employment was appropriate because they believed she had falsified patient records and removed patient records from the patients' facility. Tarlton Dep. 44:18-21, 113:1-5; Howard Dep. 154:19-155:4. Tarlton ultimately reviewed and approved the termination. Tarlton Dep. 33:16-34:2. On August 19, 2009, Howard met with Eckstrom to review BMA's findings and notify her that her employment was terminated for fraud because of the way she was completing

the insurance questionnaires.[11]   That day, Howard sent Tarlton a corrective action form,

describing the allegation and the results of the investigation and stating that Eckstrom was being

terminated "[d]ue to the failure to follow company policy by; not completing and acquiring

signatures quarterly per procedure, removing patient records from the facility, and falsifying

records."  Tarlton Dep. Ex. 6.  Eckstrom was not given this form at her meeting with Howard,

although she did understand that falsification of information pertaining to patients could result in

immediate termination.  Eckstrom Dep. 192:1-5.  She did not, however, believe that what she did

was falsification.

   After her termination, Eckstrom requested a written explanation for her termination.[12]

Tarlton, Howard and Crandall then created a document providing BMA's rationale for

terminating Eckstrom's employment.  Crandall Dep. 66:17-20.  In this document, they explained

that in response to an allegation that Eckstrom was falsifying the Social Worker Insurance

Questionnaire, the "DO" (Director of Operations) conducted an audit of Eckstrom's files.

Tarlton Dep. Ex. 11.  The "DO" located forms for the Shakopee and Southtown facilities on

Eckstrom's office desk at Midway.  There were forms that were completely filled out with

original signatures, but were missing dates, and there was one form that had white-out over the

date.  After comparing the originals to the forms submitted to the billing department, "it was

discovered the originals were used multiple times as the only item that didn't match identically

was the date written in on the forms behind the signatures."  *Id.*  The letter described the July 16

interview by Kienzle and Marietti, in which Eckstrom admitted to having copied and reused

---

[11]   Howard denies that he ever used the word "fraud."  Taking the facts in the light most
favorable to Eckstrom, the Court will assume that Howard did use this word in his description of
BMA's reason for terminating Eckstrom.

[12]   Crandall explained that under Minnesota law, Eckstrom is entitled to a summary of the
reason for separation.  Crandall Dep. 67:5-6.

previously filled-in and signed forms and to having used white-out in the past.  The letter also described the August 18 interview by Warren, including excerpts from Warren's interview notes.  Finally, the letter explained that on August 19, Howard met with Karen and concluded, based on inconsistencies in Eckstrom's statements and the confirmation that she had falsified documents, that Eckstrom should be dismissed.  This letter concluded by stating: "Due to the failure to follow company policy by; not completing and acquiring signatures quarterly per procedure, removing patient records from the facility, and falsifying records, [BMA] has terminated employment."[13]

Eckstrom does not deny that she had undated forms that were signed by patients or that she had forms on which white-out had been used.  Eckstrom Dep. 102:6-17.  In fact, she admits that after verifying with the patient that the insurance information remained unchanged from the previous quarter, instead of filling out a new form, she would make a copy of the already-signed and filled-out form from the previous quarter, update it with the correct date, and submit it for the current quarter.  Eckstrom Dep. 155:5-19, 224:1-8, 231:16-23.  Eckstrom also does not dispute that she kept patient records from other facilities in her locked office in the Midway clinic, believing that practice to be permissible as long as they were kept in a secure location.  *Id.* 100:13-102:10, 197:20-198:7.

**D.  Howard and Marietti's Conversation with Dr. Thielen**

Dr. Kimberlee Thielen, a nephrologist employed by Kidney Specialists of Minnesota, was the Medical Director at BMA's South Minneapolis and Shakopee clinics.  As the Medical Director, she was responsible for the overall care of BMA's patients and for overseeing the

---

[13]     Additional concerns were identified after Eckstrom's termination, including the discovery of additional noncompliant forms and the revelation of Eckstrom's previous licensing issues with the Minnesota Board of Social Workers.  These additional matters were not part of the decision to terminate Eckstrom.

operations in those facilities.  A meeting had been scheduled for August 20, 2009 at the South

Minneapolis clinic, and Eckstrom was expected to be there.  After Eckstrom was terminated,

Tarlton instructed Howard to meet with Dr. Thielen to inform her of Eckstrom's termination so

that Dr. Thielen would know why Eckstrom would not be at the meeting.[14]

On the afternoon of August 19, 2009, Howard called Dr. Thielen to inform her that

Eckstrom had been terminated and would not be at the meeting the next morning.  Dr. Thielen

asked why Eckstrom had been terminated and Howard responded that Eckstrom had fraudulently

submitted forms related to patients' insurance information.[15]  Dr. Thielen requested further

explanation.  Howard explained that Eckstrom had changed the date on insurance forms and

submitted them without getting a new signature.  He stated that although the information on the

forms was correct, it was nevertheless fraudulent because the form was submitted with the

patient's original signature.

Howard and Marietti met with Dr. Thielen the next morning and again informed her that

Eckstrom was terminated for fraud.  They explained in greater detail what the issue was with the

insurance forms—that social workers were required to complete quarterly insurance

questionnaires with the patients, but that Eckstrom would, after verifying the accuracy of the

information on the forms, make a copy of the form and then update it with the correct date to

submit for the appropriate quarter.  According to Dr. Thielen, Howard told her that "[e]ach

quarter Karen would go through the insurance questionnaire form with the client, verify the

information was correct and put the current date on it to show it was reviewed with the patient

---

[14]     Dr. Thielen testified that she believes she should be notified when issues arise with one of
the employees in her clinics.  Thielen Dep. 23:8-24:16.

[15]     Again, Howard denies having ever used the word "fraudulently."  The Court will assume
for purposes of this motion that he did use that word.

for that quarter." Thielen Dep. Ex. 3. BMA viewed this as fraudulent "because the patient did not resign the form that the date was changed on." *Id.* Dr. Thielen did not believe this conduct to be fraudulent and even wrote a letter on October 21, 2009 in support of Eckstrom and expressing her disappointment with Eckstrom's termination. *Id.* Dr. Thielen did, however, see how Eckstrom's conduct could be viewed as a compliance problem. Thielen Dep. 41:9-42:2.

On April 1, 2011, Eckstrom filed this lawsuit, alleging that BMA unlawfully retaliated against her for her participation in the Pandey lawsuit. She also claims that Howard and Marietti defamed her by discussing the circumstances surrounding her termination with Dr. Thielen.

## II.   DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A.  Retaliation Claims

In analyzing a retaliation claim where there is no direct evidence of retaliation, the Court utilizes the *McDonnell Douglas* burden-shifting framework. *See Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 911-12 (8th Cir. 2011). First, the plaintiff bears the burden

of establishing a prima facie case of retaliation. *Higgins v. Gonzales*, 481 F.3d 578, 589 (8th Cir.

2007). The plaintiff does so by showing that: (1) she engaged in protected conduct; (2) a

reasonable employee would have found the challenged action materially adverse; and (3) the

materially adverse action was causally linked to the protected conduct. *Carrington v. City of Des*

*Moines, Iowa*, 481 F.3d 1046, 1050 (8th Cir. 2007). The second prong is objective, requiring the

Court to consider whether a reasonable employee in the plaintiff's position might have been

dissuaded from making or supporting a charge of discrimination. *Higgins*, 481 F.3d at 589. If

Eckstrom establishes a prima facie case, then BMA must "articulate a legitimate, non-

discriminatory reason" for the action. *Carrington*, 481 F.3d at 1050. The burden then shifts

back to Eckstrom to show "the proffered justification was in fact a pretext, a cover up for

retaliation." *Id.* (internal quotation marks omitted).

### 1. *Prima Facie Case*

Eckstrom claims that she was retaliated against because of her participation in Pandey's

discrimination lawsuit. Specifically, she contends that she was retaliated against because in

October 2008, she gave deposition testimony in Pandey's lawsuit and her testimony was

referenced in Pandey's briefs to the Court and in the Court's order denying BMA's motion for

summary judgment. *See* Compl. ¶ 20. It is undisputed that her participation in Pandey's lawsuit

constitutes protected conduct.

It is also undisputed that Eckstrom's termination constitutes a materially adverse action.

Eckstrom, however, also contends that she suffered from other materially adverse actions,

including: (1) Eckstrom's managers began acting more "businesslike" toward her; (2)

Eckstrom's managers "dismissed" or "shunned" her at meetings; (3) Eckstrom felt "ostracized;"

(4) Eckstrom had difficulty scheduling vacations; (5) Eckstrom did not receive an annual

performance evaluation for 2009; and (6) Eckstrom received a "horrible" performance review in 2008.[16]

"The Supreme Court has stated that an employee is not protected 'from all retaliation, but from retaliation that produces an injury or harm.'" *Sutherland v. Mo. Dep't of Corr.*, 580 F.3d 748, 752 (8th Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006)). An action is materially adverse if a reasonable employee in Eckstrom's position would have been dissuaded from supporting Pandey's discrimination claims because of the allegedly retaliatory actions. *See Burlington*, 548 U.S. at 69. Materially adverse actions do not include "petty slights or minor annoyances . . . , personality conflicts at work that generate antipathy, and snubbing by supervisors and co-workers." *Higgins*, 481 F.3d at 589-90; *Sutherland*, 580 F.3d at 752; *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 786 (8th Cir. 2007). Material adverse actions must be separated from "trivial harms," and the federal antiretaliation provisions "do[] not set forth a general civility code for the American workplace." *Burlington*, 548 U.S. at 67.

Eckstrom contends that after her deposition, her managers became more "businesslike" toward her because they stopped coming into her office to socialize as they had previously done. Eckstrom Dep. 29:3-5, 33:21-24. She also claims that she was "dismissed" and "shunned" at meetings because she was not given the opportunity to present information and on those

---

[16]     The Court notes that it is questionable whether these actions even began after Eckstrom's deposition in 2008. At one point, Eckstrom testified that these behaviors began "before my deposition." Eckstrom Dep. 16:4-17:11. She then testified that her managers' behavior changed "after my deposition." *Id.* 95:15-16. Finally, she testified that she did not know when the behaviors began. *Id.*115:12-116:3 (Q: "So with respect to that list of complaints . . . did any of them begin in 2005?" A: "I don't know. . . . I know that those lists of complaints that we went over this morning definitely began—began after I gave my testimony in the deposition in '08." Q: "So did they not begin when you had conversation or communication with the EEOC in 2005?" A: "I'm not saying that." Q: "Did they or didn't they?" A: "I don't know. I can't remember."). Taking the facts in the light most favorable to Eckstrom, the Court will accept that many of these behaviors began after Eckstrom's October 2008 deposition.

occasions when she did present, her managers would not listen to her or would move on to

another agenda item. *Id.* 76:16-21, 81:21-82:3. Eckstrom provides only one example of such

behavior: according to Eckstrom, during one meeting in which Eckstrom was presenting,

Howard stopped listening to her presentation and "turned to start working on his laptop." *Id.*

37:24-38:7. Eckstrom also claims that she felt "ostracized" because Howard or Marietti would

"poke fun at [her] at CQI meetings . . . with various comments." *Id.* 93:2-6, 94:10-11. She

provides no specific examples of any of these comments. There is no evidence or argument as to

how any of these behaviors negatively impacted Eckstrom or caused her any injury or harm. At

most, these behaviors constitute the "petty slights" or "snubbing" that fail to rise to the level of

materially adverse actions. *See, e.g.*, *Weger v. City of Ladue*, 500 F.3d 710 (8th Cir. 2007)

(rejecting the plaintiff's claim that she suffered a materially adverse action because she was

"ostracized" by not having been included in happy hours).[17]

Eckstrom also claims that after her 2008 deposition, it became more difficult for her to

schedule vacations. She provides no specific examples of vacation requests that were denied

and, in fact, does not recall ever having a vacation request denied. Eckstrom Dep. 39:16-18. Her

only support for this assertion is that on one occasion when she requested a specific block of

time off, Howard told her that it "probably wasn't convenient" and cited concerns regarding

scheduled meetings and coverage. *Id.* 39:21-40:2, 65:11-16. This does not rise to the level of a

materially adverse action.

Eckstrom also contends that the fact that she did not receive an annual performance

evaluation for 2009 constitutes a materially adverse action. There is no evidence that she was

---

[17]     In her brief, Eckstrom claims that after her deposition, she "no longer had career-enhancing contact with management." But she provides no evidence as to what contact she was denied and how such contact would have been career enhancing.

entitled to such an evaluation at the time she was terminated.  Her 2008 review was issued on

June 23, 2008.  By the same time in June 2009, Eckstrom was already being investigated for

falsifying documents.  There is nothing to suggest that she should have been provided with an

annual review under those circumstances.  Further, Eckstrom testified that it was Clinic Manager

Linda Swan's responsibility to prepare her 2009 performance review—and she does not allege

that Ms. Swan treated her badly or retaliated against her.  Eckstrom Dep. 48:19-24.  Finally,

there is no evidence or argument to suggest that BMA's failure to provide Eckstrom with a 2009

evaluation had any negative impact on Eckstrom or caused her injury or harm.

Finally, Eckstrom contends that her "horrible" 2008 performance review constitutes a

materially adverse action.  But the June 23, 2008 review was delivered *before* Eckstrom was

identified as a potential witness in Pandey's lawsuit and before Eckstrom gave her deposition

testimony.  It is unclear how a review that predated Eckstrom's participation in a protected

activity could constitute a materially adverse employment action taken in response to her

participation.  Moreover, as noted above, previous reviews had also noted deficiencies in

Eckstrom's performance, and she was rated as overall "meeting expectations" in 2002 as well as

in 2008.  Eckstrom provides nothing to suggest that the "weaknesses" noted in the 2008 review

were inaccurate or undeserved.[18]  Finally, Eckstrom had no reductions in pay, salary, benefits or

prestige resulting from the 2008 review.  "A lower satisfactory evaluation, by itself, does not

provide a material alteration of [Eckstrom's] employment and is not actionable."  *Sutherland*,

580 F.3d at 752.

---

[18]     The Court is also hard-pressed to see how the 2008 review can be characterized as
"horrible," when it found that Eckstrom met expectations and contained highly complimentary
comments regarding Eckstrom's overall performance.

Eckstrom fails to provide any evidence as to how she was negatively affected by any of the other behaviors of which she complains. *See, e.g.*, *Higgins*, 481 F.3d at 590 (finding no materially adverse action where the plaintiff failed to establish that she was negatively impacted); *Weger*, 500 F.3d 710 (finding no materially adverse action where the plaintiff failed to show significant harm).[19] The only materially adverse action at issue in this lawsuit is Eckstrom's termination.

Eckstrom must show a causal connection between her participation in Pandey's lawsuit and her termination. For this, she relies primarily on the temporal proximity between her October 2008 deposition and the investigation beginning in June 2009 and resulting in her termination in August 2009. Although Eckstrom contends that she is not relying on temporal proximity alone, the only other evidence she points to is the alleged pattern of negative behavior discussed above. That pattern of behavior, however, is only relevant if the *timing* of that behavior is considered—i.e., if the behavior began soon after Eckstrom's deposition. She also asserts that the fact that she was not informed earlier of the anonymous complaint, was not specifically told that she was being investigated, was not given a warning before being terminated, and did not have an opportunity to see the purportedly falsified documents establish a causal connection between her participation in Pandey's lawsuit and her termination. But there is no evidence that BMA ever provided such opportunities to other employees who were under investigation.

Finally, while not dispositive here, the Court notes that only one of the decision-makers in this case had any knowledge of Eckstrom's participation in Pandey's lawsuit. Tarlton,

---

[19]     Eckstrom cites *Kim v. Nash Finch Co.*, 123 F.3d 1046 (8th Cir. 1997), in support of her argument. Unlike the plaintiff in *Kim*, however, Eckstrom's duties were not reduced, she was not forced to undergo remedial training, she did not receive lower performance evaluations after her engagement in protected activity, and her file was not "papered."

Crandall and Howard made the decision to terminate Eckstrom's employment.  Of those three individuals, only Howard was aware that Eckstrom had participated in Pandey's lawsuit. Despite Eckstrom's suggestion that Tarlton and/or Crandall may have also had such knowledge, there is no evidence in the record to support this entirely speculative suggestion.  There is also no evidence to suggest that Kienzle or Warren, the two individuals who took notes of their interviews with Eckstrom, had any knowledge of Eckstrom's involvement in Pandey's lawsuit. Nor is there evidence that compliance officer Dottie Sample or the anonymous caller who reported Eckstrom's documentations practices and initiated the investigation had any knowledge of the Pandey lawsuit or any retaliatory intent.

For purposes of this motion, the Court will assume, without deciding, that the temporal proximity between Eckstrom's participation in Pandey's lawsuit and her termination is sufficient evidence for Eckstrom to meet her burden of establishing a prima facie case of retaliation.  It is undisputed that BMA has met its burden of articulating a legitimate, nonretaliatory reason for terminating Eckstrom's employment—that she was terminated because of her practices related to completion of the Social Worker Insurance Questionnaire, as well as her removal of patient documents from the patients' care facilities.  Eckstrom therefore has the burden of establishing that BMA's proffered reason is a pretext for unlawful retaliation.

### 2.  *Pretext for Unlawful Retaliation*

To demonstrate a material question of fact regarding pretext, "[a] plaintiff may show that the employer's explanation is 'unworthy of credence . . . because it has no basis in fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (citation omitted). "Alternatively a plaintiff may show pretext 'by persuading the court that a [prohibited] reason, rather than the employer's stated reason, actually motivated the employer's action.'"  *Id.* (citation

omitted).  "A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."  *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).

Eckstrom contends that with respect to removing patient records from the patients' clinics, it was an accepted BMA practice so long as the insurance forms were kept in the social workers' locked office.  Her argument is based solely on her *belief* that this practice was acceptable to BMA—she provides no actual evidence to support this unsubstantiated belief.  For instance, she points to no other social workers who followed this practice or any evidence that the decision-makers involved in her termination were aware that other social workers may be following this practice.  Linda Swan, the Midway Clinic Manager, stated in her affidavit that the removal of records by *home health care employees* was acceptable.  Swan Aff. ¶ 12 (emphasis added).  But this does not provide any evidence that it was acceptable for *social workers* to remove patient records.  In contrast, BMA produced its written policy, which states that patient records must not be removed.  Every BMA manager, as well as Dr. Thielen, testified that the forms were to be kept at the patients' own clinics.  Kienzle Dep. 81:1-8, 83:11-12; Tarlton Dep. 66:3-6; Howard Dep. 146:20-147:10; Thielen Dep. 38:24-25.  The fact that Eckstrom was unaware of this policy does not indicate that removal of patient records was an accepted practice.  Rather, the only evidence in the record with respect to BMA's policy is that BMA employees were *not* to remove patient records from the patients' clinics, and there is no evidence that this policy was inconsistently applied.

Eckstrom also questions aspects of BMA's investigation—seemingly as an attempt to demonstrate that BMA's explanation for her termination had no basis in fact.  For example, she

claims that BMA was unable to identify and produce the specific documents that supported the allegation of falsification.  The Court notes that BMA has produced copies of at least some of the documents it relied upon, such as documents containing photocopied information and signatures but bearing different dates, as well as documents located outside of the patients' care facilities. Regardless of BMA's ability to identify and produce specific documents, Eckstrom *admitted* the conduct for which she was terminated.  She admitted during her interviews with Marietti, Kienzle and Warren, and continues to admit during this litigation, that she had used white-out at least on one occasion, photocopied nearly-completed Social Worker Insurance Questionnaires to re-use and re-date for subsequent quarters, and removed patient records from the patients' treatment facilities.  BMA relied largely on Eckstrom's admissions—not the documents themselves—when deciding to terminate her employment.  Whether or not BMA could or should have produced the documents that led to the interviews and admissions is wholly irrelevant and does not support Eckstrom's argument that BMA's explanation lacked a factual basis.[20]

Eckstrom also claims that as time progressed, BMA "grossly expanded the 'evidence' of Eckstrom alleged misdeeds."  She asserts, without citing supporting evidence, that Marietti's account was "exaggerated" and that Crandall's account was "fictional."  In light of Eckstrom's repeated admissions to the conduct for which she was terminated, even if Marietti's deposition testimony regarding his recollection of his interview contained inaccuracies, the Court does not

---

[20]     Eckstrom also suggests that some of her managers, and herself included, seemed to be confused as to precisely which of the two insurance forms were at issue.  For support, she points to the fact that the managers had different names for the quarterly insurance form, some of them calling it an "MSPQ."  But it is undisputed that the anonymous complaint referred to the quarterly form, that during each of the interviews Eckstrom discussed her practices with respect to the quarterly form, and that Tarlton—though unaware that there were two different forms— understood that the problem under investigation related to a quarterly insurance form.  There is also no evidence that the distinction between the Social Worker Insurance Questionnaire and the MSPQ mattered, because the conduct to which Eckstrom admitted—the photocopying of signed, undated forms—would have been viewed by BMA as falsification of *any* document.

find this to be a basis for calling into question the factual basis for BMA's decision.  Eckstrom

cannot ignore the fact that she has always conceded that she photocopied signed, undated forms

and that she removed patients' documents from their treatment facilities.

In addition to not being shown the specific documents at issue, Eckstrom also argues that

she was not specifically informed during the two-month investigation that she was being

investigated for falsification of documents.  She acknowledges, however, that she was aware that

Howard had searched through her files in her office, and she was aware that she was interviewed

by Marietti, Kienzle and Warren regarding her completion of the Social Worker Insurance

Questionnaire.  There is no suggestion that BMA's failure to provide Eckstrom with earlier,

more specific information would have affected the factual basis for its decision.  To the extent

that Eckstrom contends that BMA somehow deprived her of some sort of due process by failing

to show her each of the documents upon which BMA relied, and by failing to provide her with

earlier, more detailed information regarding the investigation, the Court finds the argument to be

without merit.  There is no evidence that BMA has a practice of informing employees when their

conduct is under investigation or that BMA somehow treated Eckstrom differently by not

providing her with more information.  Overall, there is no evidence that Eckstrom was entitled to

any more process than she received or that other employees were provided with additional

process beyond that provided to Eckstrom.

Eckstrom does argue that BMA failed to follow standard practices with respect to its

investigation and termination.  But her only "evidence" to support this argument is that her

Clinic Manager, Linda Swan, was not included in the investigation or termination process.  It is

undisputed Linda Swan was on medical leave from August 2009 until January 2010.   Warren

did not interview Eckstrom until August 18, and Eckstrom was terminated on August 19—during

the time Swan was on leave.  Further, although there is testimony that generally Clinic Managers are made aware of and included in termination decisions, Eckstrom provides no evidence as to what type of investigation and termination process would be utilized when an employee is under investigation for compliance issues, especially after BMA receives an anonymous complaint through its CAL hotline.  Howard was unaware of any specific investigation process.  Eckstrom, too, testified that she did not know how BMA conducted its investigations or whether her investigation was performed differently than anyone else's investigation under the same circumstances.  Eckstrom Dep. 96:14-19, 97:18-98:2.  This is not an example of an inconsistent employment practice.

Eckstrom also asserts that BMA's explanation for her termination must be pretext because there is no official policy or procedure for completing the Social Worker Insurance Questionnaire.   She claims that because BMA cannot point to a specific policy with regard to the particular form at issue, she could not have been terminated for violating such a policy. BMA, however, *never* argued that Eckstrom violated a specific policy with respect to the insurance questionnaire.  Rather, BMA has always maintained that it terminated Eckstrom for falsification of documents and for removal of patient records from the patients' clinics.  It seems to be beyond question that, especially in the medical profession, where a form contains a line for a signature and date, the signature should be given on the date provided.  The purpose of a dated signature is for the signer to attest that he or she reviewed the information and signed it on the date provided.  The Court can hardly fathom a world in which such a common-sense practice can only be enforced if it is memorialized in a formal handbook.  At no point did BMA "back off

from its original reason for terminating" Eckstrom and "[t]his is not a case of [BMA] changing

its story." *See Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 855 (8th Cir. 2005).[21]

Eckstrom does not contend that similarly-situated employees were treated differently.

For example, there is no evidence or argument that other BMA employees who participated in

Pandey's lawsuit were retaliated against.  Nor is there any evidence or argument that other social

workers utilized the same documentation practices as Eckstrom, yet were nevertheless retained.[22]

She does not point to any other employees who received different treatment from BMA while

under investigation, nor does she attempt to demonstrate that BMA applied its policies and

practices differently with respect to other employees.  Instead of comparing her treatment to

BMA's treatment of other similarly-situated employees, Eckstrom attempts to compare her

treatment before the 2008 deposition to her treatment after the deposition—thus serving as her

own comparator.

At oral argument, Eckstrom asserted that she had been completing the insurance forms

the same way for five years, and she claimed that she had in fact been taught by a previous

supervisor to complete the forms in that manner.  She concedes, however, that she did not make

this claim to BMA during its investigation and that the claim arises for the first time in the course

---

[21]     Eckstrom also points to the fact that her letter of termination was drafted and edited after
her termination, characterizing this as a "week-long collaboration to create the story of
Eckstrom's termination."  Eckstrom does not dispute, however, that this letter was created *upon
her request* and pursuant to Minnesota law.  None of the edits substantively changed the reason
for BMA's decision, and BMA's explanation has remained consistent from the very beginning
until the present.

[22]     BMA states that it conducted an audit to examine other social workers' documentation
practices and that other social workers were not utilizing the same photocopying practices as
Eckstrom.  Eckstrom questions whether any such audit ever occurred.  It is Eckstrom's burden,
however, to show that other social workers, similarly-situated to herself, completed forms in the
same way yet were treated differently; it is not BMA's burden to prove that other social workers
behaved differently.

of this litigation.  Eckstrom offers no evidentiary basis upon which knowledge of this supposed

training can be attributed to BMA.

Eckstrom also claims that the insurance forms were discussed at other meetings,

suggesting that the supervisors responsible for her termination should have been aware of her

practices prior to the anonymous call.  But there is no evidence that Eckstrom's specific practices

with respect to the forms—i.e., photocopying completed, signed, and undated forms and then

reusing those forms each quarter—were discussed at those meetings or that Howard, Tarlton or

Crandall were aware of those discussions.  *See* Eckstrom Dep. 230:19-22 (stating only that "[t]he

issues of MSPQ's and Social Work Insurance Questionnaires have been brought up in the past at

a number of social work meetings and the conference in Chicago"); *id.* 234:11-15 (stating that

the questionnaires "were brought up in Chicago" and that "everybody was completing them

differently"); Tarlton Dep. Ex. 5 (indicating that Eckstrom stated that "discussions of completing

the MSPQ's with both the patient and SW signature took place during SW meetings in the

past").  There is no evidence that Eckstrom's specific practice of photocopying signed, undated

forms was ever previously discussed—at any time, with anyone—or that Howard, Tarlton or

Crandall should have been aware of Eckstrom's long-standing practice prior to June 2009.

Given that BMA's investigation was initiated by an anonymous call into the CAL hotline

in June 2009 and the lack of evidence demonstrating that BMA was aware of Eckstrom's

practices prior to receiving the anonymous call, the timing of BMA's investigation is not

suspicious.  There is no evidence to suggest that someone with knowledge of Eckstrom's

participation in the Pandey lawsuit or with retaliatory intent initiated the investigation.  The fact

that Eckstrom had been utilizing photocopied forms for five years, but was only investigated and

terminated for such conduct in 2009, does not raise an inference of retaliatory animus.

Central to Eckstrom's argument is her persistent belief that there was nothing wrong with the way she completed the insurance questionnaires. She contends that because the substantive insurance information on the form was correct, her behavior did not constitute "falsification" and BMA should not have considered it grounds for termination. But it is not the Court's role to decide if an employer's decision to terminate an employee is correct. *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir.1995) ("[T]he employment discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995) ("[A]n employer has the right to . . . discharge—for good reason, bad reason, or no reason at all, absent intentional . . . discrimination." (internal quotation marks omitted)). "To prove pretext, the employee must do more than show that the employment action was ill-advised or unwise, but rather must show that the employer has offered a 'phony excuse.'" *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir. 2005) (citation omitted). The issue here is not whether BMA's decision was correct, but whether it acted "reasonably and in good faith." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 855 (8th Cir. 2005); *see also Johnson v. AT&T Corp.*, 422 F.3d 756, 762-63 (8th Cir. 2005) (explaining that "the proper inquiry is not whether [the employer] was factually correct" but whether the employer "honestly believed" the plaintiff had violated company policy). Here, there is no dispute that BMA was "factually correct"— Eckstrom herself admitted to the conduct on several occasions. Whether or not BMA *should* allow its social workers to photocopy pre-signed, undated forms is not a question properly before the Court.

Overall, Eckstrom has provided nothing to show that BMA's explanation is "unworthy of credence" or has "no basis in fact." *Torgerson*, 643 F.3d at 1047.  Nor has she provided any evidence that retaliation "actually motivated the employer's action." *Id.*  She has not shown that BMA failed to follow its own policies, inconsistently applied its policies, treated similarly-situated employees differently, or shifted its explanation of the employment decision.  *See Lake*, 596 F.3d at 874.  There is nothing in the record that permits an inference of retaliatory animus. *See Roeben v. BG Excelsior Limited Partnership*, 545 F.3d 639, 643 (8th Cir. 2008).  Because Eckstrom fails to provide any evidence that BMA's proffered reason for Eckstrom's termination is pretext for unlawful retaliation, Eckstrom's retaliation claims fail.

## B.  Defamation Claim

Eckstrom asserts that Howard and Marietti defamed her by telling Dr. Thielen that she had been terminated for committing fraud and for falsifying documents.  Eckstrom does not claim that Howard and Marietti should not have informed Dr. Thielen that Eckstrom was terminated—but she appears to believe that they should have refused to provide Dr. Thielen, the Medical Director for two of the clinics in which Eckstrom worked, with the reasons for which Eckstrom was terminated.

It is undisputed that Tarlton instructed Howard to meet with Dr. Thielen to inform her of Eckstrom's termination.  As the Medical Director of two of BMA's clinics, Dr. Thielen was responsible for the overall care of BMA's patients.   A meeting was scheduled for the day following Eckstrom's termination, and Dr. Thielen was expecting to see Eckstrom at that meeting.  Dr. Thielen testified that she should be notified when issues arise with one of the employees in her clinics.  After Howard told Dr. Thielen that Eckstrom had been terminated for fraud and/or falsification, it is undisputed that he specifically described the conduct for which

Eckstrom had been terminated and to which she admitted.  He explained that Eckstrom had changed the date on insurance forms and submitted them without getting a new signature, and that although the substantive information on the forms was correct, it was nevertheless fraudulent because the form was submitted with the patient's original signature.  When Howard and Marietti met with Dr. Thielen in person the next day, they provided even greater detail as to Eckstrom's specific conduct, describing the quarterly insurance questionnaires and detailing Eckstrom's practices with respect to completion of those questionnaires.  Eckstrom admitted during BMA's investigation—and continues to admit now—that she did, in fact, complete the Social Worker Insurance Questionnaire in the manner they described.

"To establish the elements of a defamation claim in Minnesota, a plaintiff must prove that: (1) the defamatory statement was 'communicated to someone other than the plaintiff'; (2) the statement is false; (3) the statement tends to 'harm the plaintiff's reputation and to lower [the plaintiff] in the estimation of the community"; and (4) 'the recipient of the false statement reasonably understands it to refer to a specific individual.'"  *McKee v. Laurion*, 825 N.W.2d 725, 729-30 (Minn. 2013) (citations omitted).  "The plaintiff has the burden of proving falsity in order to establish a successful defamation claim."  *Id.* at 730.  "Truth is a complete defense to a defamation action and 'true statements, however disparaging, are not actionable.'"  *Id.* (citation omitted).  Generally the truth or falsity of a statement is a question for the jury, but "[i]f the statement is true in substance, minor inaccuracies of expression or detail are immaterial." *Id.* "Minor inaccuracies to not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge [is] justified.'" *Id.* (citation omitted).

Viewing the facts in the light most favorable to Eckstrom, there is no genuine issue of material fact as to the falsity of Howard and Marietti's statements to Dr. Thielen.  Eckstrom

admitted—and still admits—that she would, after verifying the accuracy of the information on the insurance forms, make a copy of the form and then update it with the correct date to submit for the appropriate quarter.  No one ever claimed that the insurance information was incorrect or that Eckstrom utilized this photocopying practice to sidestep the patient.  The problem was always identified as Eckstrom's use of a pre-signed, pre-completed photocopied form with a new date.  Even if Eckstrom and Dr. Thielen did not believe this conduct should be characterized as "fraud" or "falsification," BMA believed it to be "falsification."  And the specific details of Howard and Marietti's comments to Dr. Thielen are undisputedly true.  The words "fraud" and "falsification" cannot be ripped from their context.  Howard and Marietti provided an in-depth explanation of Eckstrom's conduct and BMA's reasons for termination.  There is no genuine dispute of material fact that the "substance," "gist," or "sting" of their comments was true.  Any inaccuracy in expression did not change the meaning of what Howard and Marietti said, especially when considering the context in which their comments were given.[23]

     Moreover, even if Howard and Marietti's use of the words "fraud" and "falsification," standing alone and stripped of all context, did constitute defamatory statements, the statements are nevertheless protected by a qualified privilege if they were "made upon a proper occasion, from a proper motive, and based upon reasonable or probable cause." *Bauer v. State*, 511 N.W.2d 447, 449 (Minn. 1994).  These are generally questions of law for the Court. *Keenan v. Computer Assocs. Int'l, Inc.*, 13 F.3d 1266, 1270 (8th Cir. 1994).  "To defeat this qualified

---

[23]    Eckstrom also contends that it was wrongful for Howard to have two separate conversations with Dr. Thielen—one via telephone on August 19th and another in-person discussion on August 20th.  The content of the two conversations, however, was essentially the same, and Eckstrom fails to show that statements made during either of the two conversations— when considered in context and with respect to the detailed descriptions Howard provided—were false.  Howard's conveyance of substantially truthful statements on two separate occasions does not constitute defamation.

privilege, the plaintiff must prove actual malice." *Bauer*, 511 N.W.2d at 449.  The plaintiff can

demonstrate actual malice by showing "actual ill will, or a design causelessly and wantonly to

injure plaintiff" or "by evidence that leads to an inference that respondents knew the statements

were false, by extrinsic evidence of personal ill feeling, or by intrinsic evidence such as

exaggerated language, the character of the language used, or the extent of publication." *Keenan*,

13 F.3d at 1270 (internal quotation marks omitted).  Actual malice is generally a question for the

jury. *Id.*

  Dr. Thielen was the Medical Director of two of the facilities in which Eckstrom worked.

She was responsible not only for supervising the operations of those facilities, but also for

overseeing patient care.  It was unquestionably proper for BMA to inform Dr. Thielen of

Eckstrom's termination.  Eckstrom contends that Howard and Marietti were acting as

individuals, not in their capacity as BMA employees and managers.  But the evidence in the

record squarely contradicts this—Tarlton explicitly instructed Howard to meet with Dr. Thielen

to inform her of Eckstrom's termination.  The fact that Howard talked first on the phone with Dr.

Thielen on August 19th and then in person with Dr. Thielen on the 20th is irrelevant—at all

times he was acting on behalf of BMA and furthering BMA's purpose.  There is no evidence to

suggest that Howard and Marietti talked to Dr. Thielen outside of their official capacities as

BMA managers or otherwise acted in pursuit of some personal agenda.

  Eckstrom also argues that Howard was only authorized to inform Dr. Thielen of the fact

of Eckstrom's termination—not the circumstances surrounding it.  In her capacity as Medical

Director, Dr. Thielen's role was to ensure quality patient care—and misconduct on the part of a

BMA employee working within Dr. Thielen's clinics could certainly affect patient care.

Eckstrom relies largely on the fact that Dr. Thielen is not a BMA employee, even though she is

the Medical Director at two BMA facilities.  Regardless of the fact that Dr. Thielen did not

report to BMA management and is not a BMA employee, there was a valid business reason for

informing Dr. Thielen of the fact and circumstances surrounding Eckstrom's termination.[24]  "The

Supreme Court of Minnesota has not limited the qualified privilege to particular types of

communications or audiences," *Palmisano v. Allina Health Sys., Inc.*, 190 F.3d 881 (8th Cir.

1999), and the fact that Dr. Thielen is not a BMA employee is not dispositive, especially given

her role as the Medical Director of BMA's facilities.

 The conversations between Howard, Marietti and Dr. Thielen were conducted in private

and there is no allegation that the content of their conversations was overheard by others or

widely disseminated.  In fact, the *only* person outside of BMA that was made aware of

Eckstrom's conduct was Dr. Thielen.  These conversations were not only private, but they

occurred immediately following Eckstrom's termination and before a meeting at which

Eckstrom's attendance was expected.  Moreover, in light of BMA's investigation and Eckstrom's

own admissions, Howard and Marietti had reasonable or probable cause for conveying the

specific information regarding Eckstrom's conduct to Dr. Thielen.  *See Wirig v. Kinney Shoe

Corp.*, 461 N.W.2d 374, 380 (Minn. 1990) (citing cases in which probable cause was found

where the employer took investigative steps to confirm employee misconduct and/or the

employee admitted to misconduct).  Overall, the statements Howard and Marietti made to Dr.

---

[24]  In response to Defendants' argument that BMA had business reasons for notifying Dr. Thielen of Eckstrom's termination, Eckstrom asserts that the problem with that argument is that Howard had already notified Dr. Thielen on August 19th, and so there was no need to further that discussion on August 20th.  Thus, Eckstrom seems to implicitly concede that Howard's conversation on August 19 *was* supported by a legitimate business reason, and it was only the fact that he continued this conversation the next day that presents a problem.  Eckstrom also points to the fact that the Medical Directors at her other clinics were not also notified.  The fact that Howard and Marietti did not speak with other Medical Directors does not demonstrate that their discussion with Dr. Thielen was improper.

Thielen are the types of statements that "should be encouraged despite the risk that the statements might be defamatory." *Bol v. Cole*, 561 N.W.2d 143, 149 (Minn. 1997). They were made in good faith, upon a proper occasion, from a proper motive, and based upon reasonable or probable cause.

Eckstrom fails to put forth any evidence that would allow a reasonable factfinder to conclude that Howard and Marietti acted with actual malice. "It is well-settled in Minnesota that to demonstrate malice in a defamation action the plaintiff must prove that the defendant 'made the statement from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff.'" *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 257 (Minn. 1980) (citation omitted). Eckstrom contends that because Howard allegedly ignored her during previous meetings, used the words "fraud" and "falsification" during his discussions with Dr. Thielen, does not remember his in-person meeting with Dr. Thielen, spoke with Dr. Thielen on two occasions rather than one occasion, and did not show Eckstrom the allegedly falsified documents, there is sufficient evidence to show that Howard was acting with actual malice. She also contends that because Marietti had no personal knowledge of Eckstrom's alleged falsification and based his comments on the information he obtained from Howard, he, too, acted with actual malice. None of the above provides evidence of personal ill feeling or hostile encounters sufficient to create a genuine dispute of material fact with regard to actual malice. Nor do the words "fraud" and "falsification," especially when considered in context and in light of the detailed descriptions of Eckstrom's conduct that followed these words, constitute such exaggerated language or language of such a character that would allow a factfinder to find actual malice. The mode and extent of publication—the private, personal communication with Dr. Thielen—strongly suggest an *absence* of actual malice. Howard and Marietti did not go beyond

31

the scope of describing Eckstrom's actual behavior, and the statements were made in furtherance of the stated purpose—informing the Medical Director of Eckstrom's clinics that Eckstrom had been terminated.  Overall, there is no genuine dispute of material fact with regard to actual malice.

For the reasons discussed above, Eckstrom's defamation claims against Howard and Marietti fail.  Summary judgment in their favor is warranted.

### III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.   Defendants' Motion for Summary Judgment [Docket No. 19] is GRANTED.

2.   Summary judgment in favor of Defendants is granted on all claims.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 16, 2013

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge